# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

Plaintiff,

v.

Case No. 17-CR-167-2-JPS

DERRICK L. HARRIS,

**ORDER**

Defendant.

Defendant Derrick L. Harris ("Harris") is charged in a three-count indictment with offenses relating to retaliating against a police informant. (Docket #1). The three charges are: (1) conspiracy to retaliate against an informant, in violation of 18 U.S.C. §§ 1513(b)(2) and (f); (2) obstruction of justice by attempting to kill an informant, in violation of 18 U.S.C. § 1513(a)(1)(B); and (3) discharge of a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii).

On October 12, 2017, Harris was ordered detained pending trial by Magistrate Judge Nancy Joseph. (Docket #21). He sought modification of the order on November 28, 2017, asking that he be granted pretrial release on supervision. (Docket #52). Magistrate Joseph declined to modify the detention order. (Docket #63). Harris now seeks review of that decision in this Court pursuant to 18 U.S.C. § 3145(b). (Docket #64). For the reasons stated below, the Court will reverse the bond decision of the magistrate judge.

1.  **LEGAL STANDARDS**

Under 18 U.S.C. § 3145(b), the district court reviews a magistrate judge's bail decision *de novo*. *United States v. Portes*, 786 F.2d 758, 761 (7th

Cir. 1985). The district judge may "start from scratch" and hold a new hearing or review the proceedings before the magistrate. *United States v. Torres*, 929 F.2d 291, 292 (7th Cir. 1991). In this case, the Court finds the parties' written submissions and the existing record are sufficient to conduct its review, so it declines Harris' request for a hearing.

A defendant charged with an offense may be released on personal recognizance, released on conditions, temporarily detained to permit revocation of conditional release, or detained. 18 U.S.C. §§ 3142(a), (e). Detention is appropriate only where there are no conditions of pretrial release that will reasonably assure the appearance of the defendant and the safety of the community. *Id.* § 3142(e). In determining whether there are satisfactory release conditions, the court considers: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves narcotics; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. *Id.* § 3142(g). To sustain its burden, the government must prove by clear and convincing evidence that no condition or set of conditions will ensure the safety of the community or the defendant's appearance. *Id.* § 3142(f)(2)(B); *Portes*, 786 F.2d at 764.

If the court finds probable cause to believe that the defendant committed an offense under 18 U.S.C. § 924(c), a rebuttable presumption arises that no conditions will reasonably assure the appearance of the defendant or the safety of the community. *Id.* § 3142(e)(3)(B). An indictment charging such an offense is sufficient to trigger the

presumption. *United States v. Dominguez*, 783 F.2d 702, 706 n.7 (7th Cir. 1986). The presumption shifts the burden of production to the defendant to come forward with some evidence that if released he will not flee or endanger the community. *Portes*, 786 F.2d at 764. The rebuttal burden is "not a heavy one to meet," but even if the presumption is rebutted, it remains in the case as an evidentiary finding militating against release, although the ultimate burden of persuasion rests with the government. *Dominguez*, 783 F.2d at 707.

**2. RELEVANT FACTS**

Harris' arguments implicate both his personal background and a careful review of what precisely occurred on August 8, 2017, the night of the offense conduct. The Court will summarize the pertinent facts below.

Harris is a 26-year-old law enforcement officer. He is married and has two young children. He lacks a prior criminal record despite growing up in a dangerous neighborhood in Chicago. He has a bachelor's degree from Illinois State University. At the time of the offense conduct, he had two jobs, one as a correctional officer at a juvenile detention center and one at Home Depot. He reports that prior to the instant offense, he was in the "final stages" of being accepted for a position at the Chicago Police Department. He also holds a concealed-carry gun permit valid for both Illinois and Wisconsin.

In the evening of August 8, 2017, Harris and his co-defendants Jose Lazcon ("Lazcon"), Michael Bonds ("Bonds"), and Rashawn Bumpus ("Bumpus") were patrons at Cham Tap in Mount Pleasant, Wisconsin. Harris says he met Lazcon through playing internet basketball with him and that this night was the second time they had ever met in person. The

bar captured most of the relevant events on surveillance cameras and audio equipment.

The bar has two entryways: one on Durand Avenue near the bar's parking lot and one on Gates Street. Eventually, the four men left Cham Tap through the door on Durand Avenue. Just as the defendants left, AV1, a confidential informant in the case of *United States v. Tirado*, 16-CR-168-LA (E.D. Wis.), entered the tavern through the door near Gates Street and sat at the bar. Meanwhile, in the parking lot the four defendants said their goodbyes and Harris, Bonds, and Bumpus entered a white Chevrolet Malibu and left.

Lazcon re-entered the bar through the Durand Avenue door and observed AV1 sitting at the bar. He immediately exited the bar and yelled to his co-defendants, who had already left the area. While in the parking lot, Lazcon placed a phone call and insisted, "Come back! Come back! That guy who did my bro is here. . . . Come back!" Shortly thereafter, Harris, Bonds, and Bumpus returned. They exited the Malibu and met with Lazcon, who was animated and appeared eager to confront the informant.

The four men re-entered Cham Tap and immediately encircled AV1 from behind and verbally confronted him. Harris was seated at the bar, near AV1, when Lazcon announced to the bar patrons, "That's the snitch who told on my brother!" Harris was the first to approach AV1 and made aggressive advances against him. Several bar patrons intervened to stop Harris from assaulting AV1. One patron held Harris' arm and pulled him away.

Just before leaving the bar, surveillance showed AV1 grab a pool ball from a pool table in the bar. AV1 later explained that he grabbed the pool ball for use in defending himself. The four defendants quickly left the bar through the Durand Avenue door. Harris' co-defendants ran toward AV1, while Harris went directly to the white Malibu and retrieved an object, presumably a firearm, and placed it in his waistband. Harris then moved toward AV1 and his co-defendants.

While Harris was retrieving his firearm, AV1 was able to get into his car. But while pulling away from the area, Bonds attempted to hit AV1 at least two times. Harris was not directly involved in this attempted assault because he was preoccupied with arming himself. Bumpus was particularly furious that AV1 had gotten away and yelled a couple of times, "He got away twice!"

All four defendants then entered Harris' car, exited the parking lot, and drove in the direction that AV1 had fled. They returned several minutes later. Bumpus again expressed his frustration that AV1 had gotten away from them. Defendants were in the parking lot when AV1 drove by on Durand Avenue and turned left on Gates Street. All four began to run toward AV1's car, with Bonds and Harris in the lead.

After AV1 passed the bar and was driving down Gates Street, Harris discharged his firearm toward AV1's car. Although Harris is just off camera when he fires the shot, the footage shows Harris place the firearm back in his waistband and conceal it with his shirt. Soon after, Harris, Bonds, and Bumpus re-entered the Malibu. This time, they exited on Durand and went right.

AV1 reported to police that he was concerned that he had been shot. Although AV1 was not injured, the government contends that his car was struck on the rear driver's side door by Harris' bullet. According to the government, photographs taken by law enforcement reveal damage to AV1's car that is consistent with the grazing of a bullet. Further, the government asserts that a close review of the surveillance footage shows that the bullet damage is not present on AV1's car prior to Harris' shot.

Harris' version of the shooting differs. First, he asserts that he never fired at AV1's car. Instead, he only fired a warning shot into some nearby treetops. Harris believes the damage to AV1's car is consistent with blunt force, not a bullet. He explains that the damage is likely "blunt force injury. . ., possibly from a tire iron." (Docket #67 at 3). Because the mark is low to the ground and has an upward angle from the rear of the car, Harris posits that "[a] shooter would have had to be lying on the ground firing up, which is completely inconsistent with the video evidence." *Id*. He is presently seeking the help of a ballistics expert to corroborate his theory of the shooting.

Second, Harris contends that his conduct was mere self-defense, having nothing to do with AV1's status as an informant. Harris argues that he did not know who AV1 was and therefore could not have acted in retaliation for AV1's work. He only returned to the bar to help his friend, Lazcon, who seemed to be in trouble. As he tells it, Lazcon's "snitch" comment could be interpreted in many ways, including in relation to work or domestic matters, having nothing to do with being a police informant. Harris also points to the course of discovery thus far, arguing

that it has revealed no evidence corroborating the idea that he knew who AV1 was.

Further, according to Harris, while inside the bar AV1 taunted him and made derogatory comments. Additionally, Harris perceived AV1's acquisition of a pool ball as a "potentially deadly weapon," thus raising in his mind the need for self-defense. *Id.* at 2–3. More serious than a pool ball, however, is Harris' contention that when AV1 drove back past the bar, he slowed down and made gestures that seemed to Harris to indicate that he was holding a firearm. Harris believed AV1 would shortly exit the car and begin firing. To scare the informant away, Harris says he fired a warning shot.

On October 12, 2017, Magistrate Joseph entered an order of detention after finding that Harris presented a danger to the community if released pending trial. (Docket #19, #21). She premised this finding upon the evidence showing that Harris discharged a firearm at AV1.

On November 28, 2017, Harris filed a motion to modify the detention order. (Docket #52). In his motion, Harris provided his version of the events leading up to his discharge of the firearm on August 8, 2017. He also discussed his position that he acted in self-defense when firing his gun. Magistrate Joseph denied the motion to modify the detention order in an order dated December 7, 2017. (Docket #63). First, the magistrate noted that defendant Harris raised "many of the same arguments [in his motion] that he previously made and [she] previously considered." *Id.* at 2. She then summarized the new arguments in the motion, including his claim that he acted in self-defense, that he did not shoot at or hit the informant's car, the burden his detention places on his family, and the

difficulty his counsel has in meeting with the defendant at the Kenosha County Jail. The magistrate was "still not persuaded" that pretrial release was advisable, since "the fact remains that the discharge of a firearm, which carries a presumption of detention, weighs heavily in favor of a detention." *Id.* at 2. The day after the magistrate's latest order, Harris filed the instant objection thereto. (Docket #64).

3.   **ANALYSIS**

Harris acknowledges that he is charged with a firearms offense under Section 924(c), which triggers the statutory presumption of detention under Section 3142(e)(3)(B). He nevertheless believes that pretrial release on conditions will be sufficient to protect the community. He has made this argument twice to Magistrate Joseph without success. However, this Court, reviewing the matter *de novo*, finds that Harris has proffered sufficient facts to overcome the presumption.

First, Harris' background is not indicative of a dangerous individual. Harris is college-educated, employed, has a stable family life, is not a drug user, and has no criminal history. By all accounts, it is a surprise that he became enmeshed in the present criminality. *Dominguez*, 783 F.2d at 707 ("[E]vidence of economic and social stability, coupled with the absence of any relevant criminal record, at least suggests that defendants would be less likely to continue to engage in criminal activity while on pretrial release.").

The magistrate nevertheless considered the very dangerous conduct at issue in this case—firing a gun at a vehicle—and decided that the anomaly of Harris' crime in the context of his life did not rebut the statutory presumption in favor of detention. On this point, the Court

cannot agree. Even if the Court accepts the government's version of events as true, this lone reckless act is not enough to warrant continued pretrial detention.

The parties expend most of their energy vigorously disputing what actually occurred on August 8, 2017. These disputes are only partially relevant, however. That night's precise turn of events is relevant to whether the statutory presumption of detention arises, as it has here. The offense conduct is also relevant to the nature of the offense, which is undoubtedly serious, and the strength of the government's case, which the Court will assume is fairly strong and weighs in favor of detention. *See* 18 U.S.C. § 3142(g).

What is critically lacking in the government's proffer, however, is some argument translating the offense conduct into future dangerousness. The bond decision in *United States v. Hammond*, 204 F. Supp. 2d 1157 (E.D. Wis. 2002), makes the point. In that case, the defendant was a member of the Outlaws motorcycle gang and was charged with racketeering and drug offenses. *Id.* at 1159. Because of the drug charges, he faced a presumption of detention. *Id.* at 1164; 18 U.S.C. § 3142(e)(3)(A). The magistrate found that he had rebutted that presumption, and the district court agreed, based on evidence that the defendant was married with two children, was employed, had substantial ties to Wisconsin, was well-respected in the community, and had a minimal prior criminal record. *Hammond*, 204 F. Supp. 2d at 1164.

The district court further reasoned that the government relied too heavily on the allegations of the indictment to demonstrate the defendant's dangerousness. *Id.* The court observed that generalized

concerns about the nefarious Outlaws gang or drug trafficking were insufficient to show that this particular defendant posed some identifiable risk to the community if granted pretrial release, such as if he would have access to dangerous weapons while on release, had weapons on him when he was arrested, or posed a perceptible danger to a specific person. *Id.* Of note to the present decision, the district court further concluded that while the defendant and government vied strenuously over the strength of the government's case, this factor is generally less important in the overall scheme, as detention decisions "are not to be mini-trials." *Id.* at 1165.

Harris is analogous to the Outlaw, as he has close community ties and no criminal record at all. Harris emphasizes that he will present a "viable self-defense claim" in firing the warning shot to scare away AV1, who he believed was armed. Further, Harris proffers that during the pendency of a state prosecution that preceded the instant federal proceeding, he was released on bond for over a month without any monitoring whatsoever and nevertheless committed no crimes and did not seek out AV1. He simply continued with his daily life and attended court hearings as required. Harris also asserts that he will surrender his concealed-carry license and all firearms as a condition of release. That, coupled with monitoring or home detention, would in Harris' view satisfy the requirements of the statute.

The Court finds this proffer sufficient to overcome the statutory presumption favoring detention.[1] The Seventh Circuit in *Dominguez*

---

[1]In his objection, Harris repeats several additional points he made to Magistrate Joseph that the Court need not address directly. First, he says his family has suffered a "serious burden" through his absence which would worsen if he was detained over the winter holidays. (Docket #67 at 7). However, Harris'

stressed the notion that a defendant's past dangerousness is not sufficient on its own to warrant detention; instead, it is only relevant "to the extent that his past conduct suggests the likelihood of future misconduct." *Dominguez*, 783 F.2d at 707. Thus, the fact that there is probable cause to believe Harris committed the charged offenses carries less weight than the government appreciates. To rebut a presumption of dangerousness under Section 3142(e) does not require the defendant to disprove the charges but proffer some specific facts about his circumstances showing that despite the presumption, he will not pose a threat to the community. *Id.*

Harris' community and family ties, his willingness to surrender his firearms and concealed-carry license, and his compliance with state pretrial release all work in tandem to meet that burden. Notably, this case is unlike *Portes*, where the Seventh Circuit affirmed a detention order for a drug trafficker. *Portes*, 786 F.2d at 765. The district court had based its decision on the presumption in favor of detention, as well as evidence that three firearms were found in the defendant's home and statements of informants that officers or agents might be subject to reprisal as a result of the charges. *Id.* Here, Harris contends, and discovery appears to

---

objection was not fully briefed until December 21, 2017, leaving only one business day before the Christmas weekend. Given the need to consider the parties' nuanced arguments about Harris' conduct and history, and the press of other matters, no decision could be reached in that single day.

Second, he complains of the difficulty of preparing for trial while confined in the Kenosha County Jail, citing a "lack of privacy" and the "time consuming" process of consulting with his lawyers while imprisoned. *Id.* Magistrate Joseph instructed Harris to reach out to Jail officials to discuss his concerns, but he does not tell this Court whether he tried to do so or what the result was. Indeed, because he filed his objection the day after her ruling, it seems unlikely he actually tried to follow the magistrate's suggestion.

corroborate, that he knows nothing of the *Tirado* matter and has no motive for reprisal against AV1. Moreover, while Harris and the *Portes* defendant both possessed firearms, here Harris is ready to abandon gun ownership to secure release.

No doubt Harris acted recklessly when he brought a firearm into an already toxic situation and discharged it. Assuming it would be less culpable for a gun owner to fire wildly into the air, not knowing where his bullet will land, than to fire directly at AV1, the Court is nevertheless gravely concerned with the decision to fire the weapon at all. Yet from that decision it does not directly follow that Harris will be a danger to the community if granted pretrial release. Sufficiently restrictive release conditions, coupled with the facts discussed above, satisfy the Court that Harris will not be a threat.

4. **CONCLUSION**

For the reasons stated above, the Court finds that it must overturn Magistrate Joseph's bond decision with respect to Derrick Harris. The Court leaves to the magistrate, the parties, and the Pretrial Services Office the determination of which combination of conditions will reasonably assure the safety of the community. At a minimum, they should include surrender of Harris' firearms and concealed-carry license, but beyond that the Court defers to Magistrate Joseph.

Accordingly,

**IT IS ORDERED** that Defendant Derrick Harris' objection to Magistrate Judge Nancy Joseph's bond order of December 7, 2017 (Docket #64) be and the same is hereby **SUSTAINED**; and

**IT IS FURTHER ORDERED** that Magistrate Joseph, in conjunction with the parties and the Pretrial Services Office, will promptly craft conditions of release for Defendant consistent with the Court's ruling herein.

Dated at Milwaukee, Wisconsin, this 5th day of January, 2018.

BY THE COURT:

_____
J.P. Stadtmueller
U.S. District Judge