# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                        Plaintiff,

v.

DERRICK L. HARRIS,

                        Defendant.

Case No. 17-CR-167-2-JPS

**ORDER**

## 1.      INTRODUCTION

On October 3, 2017, Derrick Harris ("Defendant"), along with three codefendants, was initially charged by the grand jury with multiple offenses stemming from an August 8, 2017 confrontation with a government witness in an unrelated criminal prosecution. Specifically, Defendant was charged with conspiracy to engage in conduct causing damage to the person and property of the witness; attempting to kill the witness; and use of a firearm during and in relation to the commission of a crime of violence—all in retaliation for the witness having provided information to a law enforcement officer related to the commission of criminal offenses involving controlled substances. (Docket #1).

As for the more serious charge of attempting to kill the witness, it became apparent during attenuated pretrial proceedings that the government would be unable to support its theory of the case with admissible, corroborating forensic evidence. Thus, it came as no surprise that on May 22, 2018, the prosecutors returned to the grand jury to secure a superseding indictment which simply charged Defendant with one count of witness intimidation and one count of unlawful use of a firearm in

furtherance of intimidation. (Docket #123). On February 12, 2019, Defendant pleaded guilty to a single count of witness intimidation, and he was sentenced on May 9, 2019. (Docket #193, #214).

Following entry of judgment, Daniel Alexander ("Alexander"), counsel for Defendant, filed a petition seeking approval of payment for expert witness fees and expenses in the amount of $34,325.00—reduced from the expert's initial fee computation totaling more than $46,000. (Docket #218). The fee petition was referred to the assigned magistrate judge, who had earlier presided over pretrial motions. The magistrate judge issued a report and recommendation finding that the requested fees and expenses were excessive and should be reduced to $25,100.00. (Docket #224). The matter is now before the Court for further review and a final determination.

2. **STANDARD OF REVIEW**

### 2.1 Magistrate's Report and Recommendation

When reviewing a magistrate's recommendation, this Court is obliged to analyze *de novo* "those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). However, "[t]he district judge has jurisdiction over the case at all times," and the parties' lack of objection "does not preclude further review by the district judge, sua sponte[,]. . .under a *de novo* or any other standard." *Thomas v. Arn*, 474 U.S. 140, 154 (1985). The Court can "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1)(C). The Court's review encompasses both the magistrate's legal analysis and factual findings. *Id.*; *see also* Fed. R. Crim. P. 59(b).

### 2.2 Expert Fees

The Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A, provides for the representation of indigent defendants and includes provisions related to the employment of experts. Counsel appointed under the CJA may request permission to obtain expert or other services "necessary for adequate representation" of their client. *Id.* § 3006A(e)(1). Guidelines appropriate to the administration of the CJA and related statutes as adopted by the Judicial Conference expanded the scope of the CJA to permit retained counsel to use experts under the CJA in circumstances where the defendant is unable to afford such services. Specifically, § 310.10.10 provides in relevant part:

> **§ 310.10.10 Overview**
>
> (a) Investigative, expert, or other services necessary to adequate representation, as authorized by subsection (e) of the Criminal Justice Act (CJA) are available to persons who are eligible under the CJA, including persons who have retained counsel but who are found by the court to be financially unable to obtain the necessary services.

7 *Guide to Judiciary Policy*, *Defender Services*, pt. A, ch. 3, § 310.10.10(a) (2019).

The guidelines also include parameters for CJA experts employed by retained counsel, including compensation maximums. In this regard, Section 310.20.10 provides, in relevant part:

> (a) With prior authorization, compensation for investigative, expert, and other services is limited to the amounts in the following table for CJA-compensable work performed on or after the effective date.

**§ 310.20.10(a) Waivable Case Compensation Maximums for Investigative, Expert, and Other Services**

| If services were performed between... | The compensation maximum is... |
|---|---|
| 02/15/2019 to present | $2,600 |
| 01/01/16 to 02/14/2019 | $2,500 |
| 05/27/10 to 12/31/15 | $2,400 |
| 12/8/04 to 05/26/10 | $1,600 |
| 11/14/86 to 12/7/04 | $1,000 |

(b) The waivable case compensation maximum amounts apply per organization or individual, exclusive of reimbursement for expenses reasonably incurred, and per individual authorization to perform said service, except with regard to capital cases.

7 *Guide to Judiciary Policy, Defender Services*, pt. A, ch. 3, § 310.20.10(a) & (b) (2019).

Section 310.20.20, which addresses payment for authorized services in excess of the compensation limit, provides in relevant part:

**§ 310.20.20 Waiving the Case Compensation Maximums**

(a) Payment in excess of the case compensation limit for services authorized prior to the performance thereof may be made when certified by the court or U.S. magistrate judge and approved by the chief judge of the circuit (or an active or senior circuit judge to whom excess compensation approval authority has been delegated) as being necessary to provide fair compensation for services of an unusual character or duration.

(b) If it can be anticipated that the compensation will exceed the statutory maximum, advance approval should be obtained from the court and the chief judge of the circuit (or the active or senior circuit judge to whom excess compensation approval authority has been delegated).

*7 Guide to Judiciary Policy*, *Defender Services*, pt. A, ch. 3, § 310.20.20(a) & (b) (2019).

Thus, in all cases, where the final compensation exceeds the statutory maximum, the chief judge of the court of appeals must approve the final amount. *See* 18 U.S.C. § 3006A(e); CJA Guidelines § 310.20.20; CJA Form 21. In other words, a district court has no authority to unilaterally approve a final compensation amount which is over the prescribed maximum.

### 3. RELEVANT FACTS AND PROCEDURAL HISTORY

The uncontested relevant facts disclose that Defendant, a state juvenile corrections officer in Illinois, traveled to Wisconsin to meet a co-defendant, Jose Lazcon ("Lazcon"), whom he had earlier met online in connection with a computerized gaming competition.

Defendant was charged for his conduct which stems from an altercation that occurred at a bar during which he, Lazcon, and others initially pursued an individual who was an informant in an unrelated criminal case in which Lazcon's brother stood charged as a defendant. When the confrontation escalated to an adjacent parking lot and the informant began to drive away, Defendant retrieved his fully loaded Taurus 40 caliber semi-automatic pistol from his vehicle and fired what was later determined to be a single warning shot in the direction of the informant's vehicle, a 2006 maroon Chevrolet Impala. At the time Defendant was initially charged, in October 2017, the government's evidence consisted of photos, one of which follows, depicting a horizontal linear dent in the driver's side rear passenger door of the informant's vehicle.

Case 2:17-cr-00167-JPS   Filed 10/06/20   Page 5 of 21   Document 228



At that juncture, the government was unable to provide defense counsel with any evidence tending to establish that a projectile (bullet) had actually pierced or punctured the exterior surface of the door, much less any report(s) of reliable forensic analysis, including metallurgical testing, to establish that a bullet had actually struck the vehicle. Even more troubling, the government did not even have the vehicle available for inspection. *See* (Docket #51 at 1) (relaying that the vehicle had been repaired and thus, the evidence had been destroyed). The charged conduct was based entirely on photographic evidence.

Case 2:17-cr-00167-JPS   Filed 10/06/20   Page 6 of 21   Document 228

Ultimately, the government was actually able to locate the vehicle which had been sold before being repaired. *See* (Docket #74 at 2). On January 22, 2018—more than six months after the incident—the vehicle was examined by an FBI physical scientist/forensic examiner. Following the examination, which consisted of physical inspection and chemical testing, the examiner issued a written report which included findings of no evidence of bullet penetration or residue which would have otherwise confirmed that the vehicle had actually been shot. Rather, there was merely a dent in the passenger door on the driver's side, as depicted in the photo.

In late December 2017 (before learning the results of the government's forensic analysis), Defendant's counsel sought the Court's approval to obtain the services of an expert under the CJA. *Id*. Defendant sought an expert to challenge the government's contention that Defendant's shot struck the informant's vehicle. Accordingly, it would be expected that Defendant's expert would have specialized knowledge in firearms and ballistics in anticipation of rendering an opinion that a bullet did not cause the damage to the car based on the shape of the indentation, the trajectory of the bullet, and any chemical/metallurgical residue left behind. *See* (Docket #74 at 1–2). This motion would become the subject of further supplemental filings in January and February 2018. (Docket #81, #97).

Thereafter, the Court made indigency findings and issued an order approving the services of an expert in accordance with the CJA and applicable guidelines. The Court noted that although "testing of the alleged bullet damage by the government has shown no trace of copper or lead on the door. . . the government intends to call an expert witness who will opine that the damage to the car door was caused by a bullet." (Docket #108 at 1). In light of the government's proposed theory of the case, the Court

determined that an expert should be appointed, but added two limitations to the approval, one of which—relevantly—was an authorization of expenses up to $3,000.00. *Id.* The Court further instructed that "[a]ny overages must be preapproved by the Court." *Id.* at 2. These limitations were also imposed on Dr. Stephen Batzer ("Batzer"), the successor expert whose fee is the subject of this order. (Docket #131 at 2).

With the benefit of 20/20 hindsight confirmation of these now known facts, a more prudent advocate would have considered the state of the government's evidence as it existed when Defendant was charged in October 2017—a car with no physical evidence of bullet penetration or forensic evidence of bullet residue—and concluded that there was no need for an expert, much less an expert report. Thus, an appropriate motion would have been in order, either under *Daubert* or *in limine*, precluding the need for expert testimony on the ground that there was nothing an expert could add of relevance to the fact-finding process.

Instead, Alexander submitted a motion to pre-approve $8,500.00 in expert trial costs, explaining that the initial $3,000.00 cap set on Batzer's services did not include the expert's anticipated fees for trial preparation, trial, and related travel. (Docket #135 at 2–3). The Court deferred ruling on this motion until the government's *Daubert* challenges to Batzer's qualifications and findings were resolved, explaining that resolving the *Daubert* challenges might well obviate the need to give further consideration to such "significant" expert expenses. (Docket #137 at 2).

After extensive *Daubert* briefing, the motion for trial expenses was ultimately mooted by Defendant's decision to enter into a plea agreement. Subsequently, Batzer submitted an invoice to Alexander, who in turn forwarded the fee request to the Court for payment. (Docket #218). The

amount requested—$34,325.00—is over eleven times the $3,000.00 compensation limit the Court, not only *once*, but *twice*, had originally approved. (Docket #108, #120).

**4.    ANALYSIS**

### 4.1    Expert Services Neither Approved nor Necessary

At the risk of stating the obvious, a criminal defense attorney has an inherent duty "to communicate with the proposed expert in order to ensure that the expert understands what services are sought and the attorney understands what services will be provided." *United States v. DuBois*, No. 00-20027-JWL, 2001 WL 135841, at *1 (D. Kan. Feb. 8, 2001). If the expert's services are projected to cost more than the initially authorized amount, defense counsel must seek court approval for the additional costs *before* the additional services are rendered. *See id.*; 18 U.S.C. § 3006A(e)(3); *see also* Instructions for CJA Form 21, *available at* https://www.uscourts.gov/forms/vouchers/authorization-and-voucher-expert-and-other-services ("NOTE: Prior authorization from the presiding judicial officer must be secured for all investigative, expert, or other services where the total combined costs (excluding reimbursement for reasonable expenses) will exceed the limitations set forth in § 310.20.30 of the CJA Guidelines."); *see also* CJA Form 21 ("Note: Prior authorization should be obtained for services in excess of $800, excluding expenses.").

When seeking compensation above the initially approved fee, counsel must present sufficient evidence that the services rendered were "of an unusual character or duration" and "necessary to aid the court." *DuBois*, 2001 WL 135841, at *2; *United States v. Alkaramla*, 872 F.3d 532, 533 (7th Cir. 2017) (noting that the CJA caps expert fees "except in extraordinary circumstances"); *United States v. Napert*, No. 94-5615, 1995 WL 627708, at

*1–2 (4th Cir. Oct. 25, 1995) (upholding a determination that an expert was only entitled to $1,000.00 where the issues before the court were "not so complex as to warrant a higher sum."). When seeking retroactive approval of compensation, defense counsel has the additional responsibility of explaining why prior authorization was not practicable. *See Alkaramla*, 872 F.3d at 533; 18 U.S.C. § 3006A(e)(2)(B). Finally, as earlier referenced, any amount over the statutory maximum must be approved by the chief judge of the court of appeals. *See* 18 U.S.C. § 3006A(e); CJA Guidelines § 310.20.20.

In this case, Alexander never sought the Court's approval for consultation with Batzer on the *Daubert* issues, which is where Batzer explains that most of the costs were incurred. Without prior approval, Batzer would have only been permitted to incur costs of up to $800.00. CJA Guidelines § 310.20.30(a). In Alexander's petition for costs, he erroneously contended that "the Court stated that [Batzer's] time would be reimbursed following the hearing, provided he was allowed to testify." (Docket #218 at 2). Alexander cites nothing to support this representation. In fact, in its order deferring ruling on the motion for trial costs, the Court explained its decision was "[b]ecause of the significant amount of taxpayer expense involved in securing Batzer's appearance at trial, and because resolution of the government's *Daubert* challenge may affect the need for that expense." (Docket #137 at 2).

The magistrate observed that it was "unclear whether [Defendant] sought prior approval for all of the overages," perhaps assuming, albeit erroneously, that Defendant "had pre-approval for Dr. Batzer's work associated with the *Daubert* motion" in light of the fact that the Court's order deferring ruling on the *Daubert* motion made "no distinction between expenses for Dr. Batzer actually testifying at trial and the work it would

take to determine whether Dr. Batzer was qualified to testify at trial." (Docket #224 at 6). But there is no record that Defendant ever sought prior approval for these overages. Moreover, Defendant's counsel grossly misrepresented this Court's order, which openly expressed concern for the "significant amount of taxpayer expense," and declined to approve costs of $8,500.00 because—crucially—the Court supposed the *Daubert* challenge might obviate those expenses. (Docket #137 at 2).

Since counsel never requested prior approval for these overages, he must not only demonstrate that these overages were necessary and unusual in character, but that the services could not await prior authorization. CJA Guidelines § 310.20.30(b); 18 U.S.C. § 3006A(e)(2)(B). Once again, the chief judge of the circuit court of appeals would need to approve any amount exceeding the statutory limit. *Id.*

Alexander has not demonstrated that these services were even necessary, much less unusual or urgent. In his own motion to approve expert costs, he explained that the government's expert "could cite no instances in his career or any publications where copper and lead from a bullet strike on sheet metal had simply washed off when exposed to the elements." (Docket #218 at 3). Alexander then referred to one of the government's proffered publications to support the contention that "the reagent test was the only sure way to make the determination" that the bullet had struck the car. *Id.* at 3. As explained above, the government did not have a reagent test, or any other chemical evidence, to support its conclusion that the bullet struck the car. Additionally, the photos of the ostensible bullet mark on the car are wholly unpersuasive. In short, the government had no evidence with which to prove their case beyond reasonable doubt. And yet, counsel for Defendant believed that "Batzer's

Case 2:17-cr-00167-JPS   Filed 10/06/20   Page 11 of 21   Document 228

work was absolutely key to convincing the government to drop the 924(c) count." *Id.* at 3. But Alexander has not demonstrated that Batzer's testimony in this case was ultimately even necessary, much less of unusual character as to warrant additional expense, to say nothing of his failure to explain why he could not have at least sought prior approval from the Court for these expenses. Finally, there is no indication that the Chief Judge for the Seventh Circuit Court of Appeals would even consider—much less approve—such an extravagant, indeed outrageous, fee request.

In the end, the facts of this case simply do not merit the requested compensation. In his invoices, Batzer explains that "the *vast majority* of the time and expense incurred within the *US vs Harris* case was for the government initiated Daubert hearing and work required to rebut the prosecutor's allegation that [Defendant] shot the vehicle of the informant." (Docket #218-1 at 1) (emphasis in original). This mischaracterization of the defense's burden belies Alexander's failure to communicate effectively with his expert. The defendant had no obligation to rebut the government's evidence; he merely needed to cast reasonable doubt upon it. As explained above, this should not have been a difficult or time-consuming pursuit since the government's evidence, although perhaps initially measuring up to a probable cause standard, fell abysmally short when measured against the beyond reasonable doubt standard required at trial. Instead, Alexander charged Batzer with the all but impossible task of attempting to prove a negative.

In the end, the expert's fees in this case may be best described as nothing short of a runaway train with virtually no overarching concern in the first instance as to whether the services of the expert were both reasonable and necessary, much less appropriately accounted for the

stewardship of limited taxpayer dollars. In other words, nothing to be concerned about here–someone else is footing the bill.

### 4.2 Propriety of Expert Testimony on Ballistics

The fees in this case ballooned with Batzer's involvement in the *Daubert* briefing, which is symptomatic of a larger problem in the justice system involving the admission of expert testimony. In federal courts, expert testimony is admissible "if (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; *and* (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702 (emphasis added). The rule is not disjunctive; in order for expert testimony to be appropriate, all four criteria must be fulfilled.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* the Supreme Court instructed judges to serve in "a gatekeeping role" for expert witness testimony and "assess[]. . .whether the reasoning or methodology underlying the testimony is scientifically valid." 509 U.S. 579, 592–93, 597 (1993). *Daubert* counsels that in assessing the reliability of the methods, courts should consider whether a theory or technique is testable; the extent to which it has been peer reviewed; whether it has a known or potential error rate; whether it has standards that control its operation; and whether the theory or technique is accepted within the scientific community. *Daubert*, 509 U.S. at 593–94.

Alexander sought to use Batzer as an expert on (1) the inclination of the angle of the bullet; (2) the shape of the indentation on the car (i.e., whether a bullet caused the indentation); (3) a trace metals analysis of the

vehicle; and (4) the defendant's credibility. *See* (Docket #185 at 1–2). After a deferential review of the magistrate's decision pursuant to Federal Rule of Criminal Procedure 59(a), the Court permitted Batzer to testify on the angle of the bullet and the shape of the indentation on the car. *Id.* However, there was precious little discussion before either the magistrate or this Court about the relevant *Daubert* factors as they relate to the methodology behind Batzer's analyses—most of the parties' briefing concerned Batzer's expertise and experience, as well as whether he accurately reconstructed the alleged shooting scene. *See* (Docket #162 at 8–9, 11–13). Initially, this Court allowed the "shaky but admissible" evidence, with the understanding that it would be subject to "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596; *see also* (Docket #185 at 4). But the fact that Batzer apparently spent a significant amount of time defending his testimony before the *Daubert* challenges amply suggests the testimony warrants further scrutiny.

In a recent order on the admissibility of expert testimony regarding toolmark identification techniques, a District of Columbia trial judge levied a scathing critique of federal courts' wholesale abdication of their gatekeeping duties when it comes to firearm and toolmark identification expert testimony. *See United States v. Martin Tibbs*, Case No. 2016 CF1-19431 at 13–14 (D.C. Super. Ct. Sept. 5, 2019) (noting that "most[] courts resolved the objection to firearms and toolmark identification testimony without conducting any hearing at all" and observing that "no trial court has entirely excluded firearms and toolmark evidence in its entirety."). While *Tibbs* and other courts to consider the propriety of toolmark identification testimony have primarily done so in the context of matching bullets and

cartridge casings to firearms, the inquiries into the methodologies behind such toolmark identification are equally applicable to this case.

Batzer's testimony about the shape of the indentation in the car—and the angle at which a bullet would have needed to strike it—constitutes "toolmark identification," which is "a discipline that is concerned with the matching of a toolmark to the specific tool that made it." *United States v. Otero*, 849 F. Supp. 2d 425, 427 (D.N.J. 2012). "Forensic toolmark identification rests on the notion that manufacturing processes leave behind 'toolmarks' when a hard object, the tool, comes into contact with the relatively softer manufactured object." *Tibbs*, 2016 CF1-19431 at 3 (citing Nat'l Res. Council, Nat'l Academies, *Strengthening Forensic Science in the United States: A Path Forward* 150 (2009)). An appropriate *Daubert* inquiry into Batzer's expert testimony should have probed not only his education and qualifications, but also his *methods* for evaluating the deformation of the sheet metal and identifying the source as a blunt object (particularly since his methodology included "feeling the dent with the index finger."). (Docket #141-6 at 8). Instead, the discussion focused on whether Batzer had relevant education and experience working with sheet metal, and whether he reconstructed the shooting scene accurately. (Docket #166 at 90:10–24). Regrettably, this entirely missed the mark, as it were.

At one point during the *Daubert* hearing, Alexander referred to Batzer's analysis of the angle at which the bullet was shot as, "simply trigonometry." (Docket #166 at 92:23). But at no point in the hearing did Batzer ever explain these trigonometric principles. Batzer's expert report comes closer to demonstrating the relevant calculations, *see* (Docket #141-6 at 5), but even here, there is something to be desired. Batzer explained that he first estimated the angle of the indentation based on "photographic

analysis," then physically measured the door (after it had been recovered six months after the incident occurred), then averaged the two measurements to arrive at the indentation angle that he used in his calculations. *Id.* at 4–5. Some of the *Daubert* factors apply here, and should have been addressed: How does one analyze an angle of indentation via a photograph? Is this a standard way to determine the angular inputs when the actual value is unknown? What is the margin of error in Batzer's calculation? *See Daubert*, 509 U.S. at 592–93. It is entirely possible that Batzer's calculations were proper, but they are presented with a stunning lack of quantitative rigor. Simply put–saying so does not make it so.

Batzer's indentation analysis is similarly bereft of technical justification. Here, Batzer provides a photo of a bullet mark to a car to show what a bullet mark actually looks like (unsurprisingly, is does not resemble the mark on the maroon 2006 Impala). Batzer explains that he re-created the bullet mark, then made a "careful viewing of th[e] dent," and "fe[lt] the dent with [his] index finger." (Docket #141-6 at 8). This led Batzer to conclude that "[t]he bullet dent is profoundly not like the indentation impressed into the maroon 2006 Impala." *Id.* In support of his conclusions, Batzer explained that there are relevant discontinuities and asymmetries in the dent's texture, as well as paint residue marks from the bullet that were not present on the maroon 2006 Impala. *Id.* at 9–10.

At this point, the shortcomings should be obvious. When an expert conducts a visual and tactile observation of a firearms mark, what is he looking for? What are the standards that a toolmark identifier abides by when examining a mark? What are the independent characteristics of a bullet mark? In other words, what are the "objective criteria" that Batzer applied, "which can be analyzed, debated, and critiqued"? *Tibbs*, 2016 CF1-

19431 at 47. Batzer's conclusions on this issue hearken one of the problems with the expert testimony in *Tibbs*, where, in the absence of any "objective yardstick to support or explicate the expert's opinion," the expert was "left to rely on her own thoughts and conclusions based only on the vagaries of her own training and experience." *Id.* at 48.

The extent of Batzer's proffered testimony, assuming that it was necessary in the first instance, should have focused on the characteristics of a bullet mark on a car. He should have provided a bases for that knowledge that was grounded in testable, objective, and generally accepted criteria. He could have included photographs of bullet marks to illustrate these criteria. This would have sufficiently provided the fact finder with the information needed to conclude that, in this case, the mark on the informant's vehicle was not from a bullet. There was no need for multiple re-enactments. *See* (Docket #166 at 23:15–16) (in which Batzer testified that "since I had a Daubert challenge applied against me, I went and shot that car a number more times to see if I could, you know, add to my knowledge base on that, and all the bullet markings look qualitatively the same.").

Perhaps Defendant felt that the government's unreasonable case warranted an unreasonable defense strategy. The problem, though, is that a large portion of Batzer's astronomical fees are attributed to his role in defending his testimony against the government's *Daubert* challenges. With a growing number of courts becoming more conscientious about the use of toolmark identification testimony, it might have been a good use of time to address some of the relevant concerns in the field. *See e.g., United States v. Romero-Lobato*, 379 F. Supp. 3d 1111, 1116–18 (D. Nev. 2019) (critiquing the reliability of an expert witness's toolmark identification method, which was promulgated by the Association of Firearm and Toolmark Examiners),

*United States v. Green*, 405 F. Supp. 2d 104, 119–24 (D. Mass. 2005) (explaining that an expert's potentially biased review of toolmark evidence, the lack of standards in the field, and the expert's lack of error rate and proficiency testing, warranted limitations on his testimony); *United States v. Glynn*, 578 F. Supp. 2d 567, 570, 574 (S.D.N.Y. 2008) (noting that "ballistics examination not only lacks the rigor of science but suffers from greater uncertainty than many other kinds of forensic evidence" and subsequently limiting an expert's toolmark testimony). And yet, despite hours of bills, the Court has virtually no basis upon which to conclude that Batzer's methods were reliable, much less of any help to a jury.

### 4.3    Reasonableness of Fees

If the foregoing concerns, standing alone, were not sufficient to question Batzer's fees, there is an equally troubling concern with regard to the reasonableness of Batzer's hourly rate. Of necessity, the Court takes the opportunity to illustrate the higher-end range of fees contemplated for CJA experts, in order to compare them with Batzer's fee request.

In December 2019, the Judicial Conference of the United States Committee on Defender Services issued a memorandum increasing the hourly rate ranges for service providers in CJA "mega cases." The purpose of these rate ranges is to "reduce service provider costs in potentially high-cost CJA representations. . .[while] ensur[ing] the continued provision of high-quality representation under the CJA." *See* Memorandum from the Judicial Conference Committee on Defender Services to the Judges and Employees of the United States Court System (Dec. 10, 2019) (attached to

this Order as "Exhibit A").[1] The Judicial Conference noted that service providers on the higher end of the rate range—i.e., those who have specialized skills or a mastery in a relevant area of science—would be compensated at a rate of $125.00 per hour. *Id.* Nonetheless, the Judicial Conference anticipated that "most service providers will be compensated at the low end of the revised rates," i.e., around $75.00 per hour. *Id.*

Batzer's hourly billing rate was $400.00 per hour. Leaving aside the question of whether Batzer had specialized skill or mastery in a relevant scientific area—his credentials were the subject of the government's *Daubert* challenge—the fact remains that his rate was many times above the rate contemplated under the CJA for the most qualified experts in the most complex cases. This case was not even close to a mega case, although it certainly consumed an outrageous amount of time and resources that, in the Court's view, were wholly unnecessary. The issues were straightforward, the evidentiary dispute was simple, and the case itself could have been easily resolved had the defense held the government to its burden of proof as opposed to having taken on the task of attempting to prove a negative. Make no mistake, the fee request in this instance amply underscores the wisdom of precisely why it is that the Judicial Conference has taken great pains to establish guidelines for both attorney's fees and other services available to indigent defendants under the CJA.

The Judicial Conference has encouraged district courts to use discretion in expanding the rate ranges in certain circumstances, but this

---

[1]For reference, a non-capital mega case occurs where attorney hours are expected to exceed 300, or where the total case expenditures (for appointed counsel and other services such as, for example expert services) are expected to exceed an amount that is 300x the standard CJA attorney hourly rate. *Id.* n.1.

case is so far from those circumstances that the issue barely warrants attention much less serious consideration. In the interest of thoroughness, however, the Court notes that those factors supporting an expansion in rate range may include: (1) the "uniqueness of the service or service provider;" (2) the provider's "education, training, reputation, or specialization;" (3) the availability of similar providers; (4) the "seriousness of the case;" (5) the case's time-sensitivity; (6) the "particular needs of the case or client;" and (7) "other factors relevant to the circuit or district." *Id.*

These factors do not begin to support compensating Batzer at a rate more than *twice* the highest rate contemplated for specialists in mega cases. This would be true even if his testimony were useful. And when these factors are considered in light of the facts of this case, it becomes clear just how outrageously inappropriate Dr. Batzer's fee request truly is.

## 5.    CONCLUSION

The magistrate rightly concluded that some of Batzer's invoices were vague and over-stated. More important however, is the fact that the analysis failed to consider that the Court's approval was capped at $3,000.00, and explicitly required Alexander to obtain written approval from the Court before incurring any additional costs. *See* (Docket #131 at 2). Alexander's failure to do so ran afoul not only of the Court's order, but of Congress's statutory limitations and applicable CJA guidelines as well. Additionally, the recommendation before the Court did not meaningfully address the necessity of the expert in preparing *Daubert* objections, and whether his services were "of an unusual character or duration." 18 U.S.C. § 3006A(a)(1), (e)(3). Finally, the magistrate failed to address the fact that, when all is said and done before the district court, the Chief Circuit Judge must authorize any payment over the statutory maximum—in this instance

multiple times that statutory maximum. This is especially troublesome because in retrospect, the underlying facts of this case go a long way to suggest that the need for an expert might well have proven unnecessary, particularly in the context of a trial before a jury.

Accordingly,

**IT IS ORDERED** that Defendant's motion to approve expert payment (Docket #218) be and the same is hereby **GRANTED in part and DENIED in part** as stated in the terms of this Order;

**IT IS FURTHER ORDERED** that Dr. Stephen Batzer be and the same is hereby awarded a fee of $3,334.06 ($2,600.00 plus expenses of $734.06) pursuant to 18 U.S.C. § 3006A(e); and

**IT IS FURTHER ORDERED** that the magistrate judge's report and recommendation (Docket #224) be and the same is hereby **OVERRULED in part and ADOPTED in part** as stated in the terms of this Order.

Dated at Milwaukee, Wisconsin, this 6th day of October, 2020.

BY THE COURT:

_____

J.P. Stadtmueller
U.S. District Judge